IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KELLI GOODIN, *et al*, | ) | CIVIL NO.  06-00344 JMS/BMK |
| | ) | |
| Plaintiffs, | ) | |
| | ) | AMENDED ORDER GRANTING |
| vs. | ) | PLAINTIFFS' MOTION FOR |
| | ) | SUMMARY JUDGMENT AND |
| INNOVATIVE TECHNICAL | ) | DENYING DEFENDANTS' |
| SOLUTIONS, INC., *et al*, | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| Defendants. | ) | |
| _____ | ) | |

**AMENDED ORDER GRANTING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

## I.  INTRODUCTION

Cross-motions for summary judgment require the court to determine whether the Defendants' elimination of the Plaintiffs' right to receive put options for in-kind distributions of non-public stock distributed from a 401(k) and employee stock ownership plan constitutes a violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.  The court finds that the termination of the plan participants' right to receive put options for in-kind distributions is a violation of 29 U.S.C. § 1054(g) ("Anti-Cutback Provision") which is not statutorily exempted by 29 U.S.C. § 1054(g)(3)(B) ("ESOP Exception").  The court therefore GRANTS Plaintiffs' Motion for Summary

Judgment and DENIES Defendants' Motion for Summary Judgment.

## II. <u>BACKGROUND</u>

**A.        Factual Background**

Plaintiffs Kelli Goodin, Jim Cummings, Kristal Hernandez, Chris Hill (individually and as trustee of the Chris Hill IRA), Linda Karins (individually and as custodian for Cassidy Karins, Dylan Karins, and James Karins III), Mike Lukacs, William Robinson, Cathy Robinson, Russ Schaefer, David Sugimoto, and Tracy Yost (collectively "Plaintiffs") bring suit on behalf of themselves and derivatively on behalf of the Innovative Technical Solutions, Inc. 401(k) Stock Ownership Plan and Trust. Plaintiffs are former employees[1] of Defendant Innovative Technical Solutions, Inc. ("ITS") and were all participants in the ITS 401(k) Stock Ownership Plan and Trust ("the Plan").[2]  ITS, a Hawaii corporation, was founded on September 30, 1998 and was capitalized primarily through

---

[1]  The termination dates of the Plaintiffs are as follows: Cathy Robinson, December 7, 2001; Tracy Yost, April 1, 2003; Linda Karins, August 13, 2004; Russ Schaefer, December 8, 2004; Mike Lukacs, December 31, 2004; Kelli Goodin, January 4, 2005; Chris Hill, March 4, 2005; Kristal Hernandez, April 1, 2005; Jim Cummings, October 1, 2005; William Robinson, October 14, 2005; David Sugimoto, October 14, 2005.  Compl. ¶ 71.

[2]  The present dispute centers on the elimination of the right of participants to receive put options for distributions of ITS stock from the Plan. When discussing the overarching instrument and program established by the ITS 401(k) Stock Ownership and Trust Plan, the court refers generally to the "Plan." When specifically addressing the pre-amended or original version, the court refers to the "1998 Plan." The court references the amended or new version as the "2004 Plan."

employee purchases of ITS stock.  ITS stock is not publicly traded.

### 1.    *The 1998 Plan*

The 1998 Plan became effective on November 1, 1998, shortly after the founding of ITS.  The 1998 Plan contained both an employee stock ownership plan portion ("ESOP portion") and a 401(k) profit sharing plan portion ("401(k) portion").  The 1998 Plan provided that it was to be "administered as a single trust with two sub-trusts.  One sub-trust shall hold the funds and stock attributable to the ESOP Portion of the Plan and the other sub-trust shall hold the Salary Deferral and Rollover Accounts that are attributable to the 401(k) Portion of the Plan." 1998 Plan § 10.1.

The ESOP portion of the 1998 Plan was "designed to be an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code and Section 407(d)(6) of ERISA."  *Id.* §§ 1, 2.28.  The ESOP portion was to be funded by exempt loans and discretionary cash contributions from ITS which would be invested in ITS stock.  *See id.* §§ 2.28, 4.1(d), 4.3(b), 4.4, 5.1(c)-(d), 5.1(f)(i). However, ITS never made any discretionary contributions to the ESOP portion of the Plan, nor arranged for any loans, and the ESOP portion of the 1998 Plan was apparently never funded.

Instead, ITS shares, including Plaintiffs' shares, were held in the 401(k) portion of the Plan. The 401(k) portion of the 1998 Plan is a profit sharing plan "separate and distinct from the ESOP Portion of the Plan." *Id.* § 2.32. Under the 401(k) portion, participants purchased ITS stock through salary deferrals; these shares were held in the Salary Deferral Accounts. *See id.* §§ 4.1(a), 4.8. ITS also matched the salary deferrals of certain employees by making cash contributions to the participants' Salary Deferral Accounts. *See id.* § 4.1(b); Pls'. Ex. N. Participants were also able to transfer assets from other qualified plans to Rollover Accounts. The Salary Deferral Accounts and Rollover Accounts were both held in the 401(k) portion.

Two events are required for distribution of benefits under the 1998 Plan: (1) a separation from ITS employment and (2) an election by the separated participant to receive a distribution. *See id.* §§ 8.1, 8.2(a), 8.3, 8.5(b)(3). Participants were entitled to benefit distributions at death, disability, or termination of service with ITS. *See id.* § 8.5(a). The schedule for the distribution of benefits applicable to ITS stock differed according to the instigating event. Distributions for retirement, death, or disability commenced on the allocation date of the plan year following the plan year in which the instigating event occurred and were made over a 5-year period. *See id.* § 8.5(e)(1). All other distributions,

4

including termination, were subject to a 5-year waiting period before the

distributions were made; when distributions commenced, they were spaced over a

5-year period ("5 and 5 Rule").  *See id.* §§ 8.5(e)(2), 8.5(e)(4).

The 1998 Plan provided that distributions of ITS stock would take the

form of either in-kind stock distributions or cash; the form would be determined

by an ITS committee designated to oversee and implement the functioning of the

Plan ("Plan Administrator").  If the Plan Administrator elected to make a cash

distribution, participants had the right, before the benefit distributions

commenced, to demand that the distribution of the participants' vested interest

attributable to ITS stock be in-kind.  *See id.* § 8.6.  In the event that the

distributions were in-kind, whether by election of the Plan Administrator or by

demand of participant, the 1998 Plan guaranteed a put option through which any

participant could require ITS to repurchase the distributed in-kind stock:

> Any Participant or Beneficiary who receives a distribution in
> the form of Employer Stock pursuant to Section 8.6 shall be
> entitled to put such Employer Stock to the Employer at any
> time within sixty (60) days after the date of distribution and
> within the first sixty (60) days of the Plan Year next succeeding
> the Plan Year in which distribution was made by notifying the
> Employer in writing that the put option is being exercised.

*Id.* § 8.7.  The 1998 Plan set the put option exercise price as "the fair market value

of the Employer Stock determined as of the immediately preceding Allocation

Date in accordance with the provisions of Article 5 and Treasury Regulation Section 54.4975-11(d)(8)." *Id.*

### 2.    *The 2004 Plan*

On December 6, 2004, ITS's Board of Directors replaced the 1998 Plan with the 2004 Plan, retroactively effective as of January 1, 2004.[3]  *See* Minutes from the Meeting of the Board of Directors of ITS, December 6, 2004, attached as Defs'. Ex. C.  The Defendants declared that the assets previously held by participants in the 1998 Plan were transferred to the 2004 Plan to be held and distributed thereunder.  As with the 1998 Plan, the 2004 Plan included both 401(k) and ESOP portions.  However, the ESOP portion continued to be unfunded and the participants' shares, including those of the Plaintiffs, were held in the 401(k) portion.

The termination of the 1998 Plan and adoption of the 2004 Plan eliminated the right of the plan participants -- including the Plaintiffs -- to receive

---

[3]  ITS used the same plan identification number and name for both the 1998 and 2004 Plans.  Further, the record includes the ITS Notice to Interested Parties in which ITS refers to the "plan amendment."  *See* Compl. Ex. Y.  Apart from changes to provisions concerning put options and timing of distribution benefits, a comparison of the 1998 and 2004 Plans reveals that much of the content is the same.  Thus, the 2004 modifications appear to be amendments to the 1998 Plan (rather than, as Defendants argue, a termination of the 1998 Plan and adoption of the 2004 Plan).  In any event, ERISA's Anti-Cutback Provision applies regardless of whether an elimination takes the form of an amendment or the adoption of a superseding plan.  *See infra* note 7.

put options for in-kind distributions of ITS stock from the 401(k) portion.  In

contrast to the 1998 Plan, which provided for put options for any participant who

received any distribution of ITS stock from either the 401(k) or ESOP portions,

the 2004 Plan provides for put options for distributions only from the ESOP

portion of the plan:

> Any Participant or Beneficiary who receives a distribution in
> the form of Employer Stock out of the ESOP Portion of the
> Plan pursuant to Section 8.6 shall be entitled to put such
> Employer Stock to the employer at any time within sixty (60)
> days after the date of distribution and within the first sixty (60)
> days of the Plan Year next succeeding the Plan Year in which
> distribution was made by notifying the Employer in writing that
> the put option is being exercised.

2004 Plan § 8.7.  An  ITS 401(k) Stock Ownership Plan Summary of Material

Modifications Effective January 1, 2004 ("Summary of Material Modifications")

explained the change regarding the availability of put options under the 2004 Plan:

> Shares held in the new 401(k) Plan are no longer covered by
> the right to sell shares back to the Plan or the employer upon
> distribution following termination of service as was the case
> under the prior ESOP.
>
> When you are eligible for benefits, your employer shares in the
> new Plan will be distributed to you in kind under the new Plan
> provisions and will not convertible [sic] to cash except under
> limited circumstances described under a new Shareholder

Agreement[4] applicable to all shares of capital stock of the employer (a copy of that Agreement is available from the Company on request).

Summary of Material Modifications ¶¶ 3, 4, attached as Compl. Ex. V.[5]

The 2004 Plan also changed the schedule of distributions following an instigating event. While the 1998 Plan spaced distributions over 5 years for deceased, disabled, or retired employees and implemented the 5 and 5 Rule for terminated employees (a 5-year waiting period following termination from ITS and then distributions spaced in equal installments over the subsequent 5-year period), under the 2004 Plan, Plaintiffs' ITS stock is distributable only in a lump sum in-kind payout without a put option within 90 days of Plaintiffs' election after separation of service. *See id.* §§ 8.5(b)(3), 8.5(d)-(e), 8.6. The real life impact of

---

[4] Also on the same date, December 6, 2004, the Board of Directors adopted a new shareholders agreement ("2004 Shareholders Agreement") which was approved by shareholders at a special meeting on February 9, 2005, with an effective date of March 4, 2005. While the existing Shareholders Agreement ("1999 Shareholders Agreement") required ITS to repurchase the shares from a shareholder-employee who was involuntarily terminated without cause, the 2004 Shareholders Agreement did not include any mandatory repurchase event. Specifically, the 2004 Shareholders Agreement eliminated "the required purchase and sale of common stock by the Company and/or other Shareholders upon the occurrence of any particular events involving any Shareholder" except for certain limited circumstances not relevant here. *See* Amended and Restated ITS Shareholders Agreement Recitals (ii). The 2004 Shareholders Agreement also provided for the automatic conversion of Class A ITS stock to Class B non-voting ITS stock upon the termination of an employee's employment. *See* Amended and Restated ITS Shareholders Agreement § 2.1.

[5] It is unclear when the 2004 Plan and Summary of Material Modifications were distributed to Plan participants; counsel for Plaintiffs stated at oral argument that the Summary of Material Modifications was not distributed until August 2005. *See* Oral Argument Tr. 16.

the change is that instead of holding a security with a set strike price and

guaranteed cash market, the Plaintiffs are left holding a stock certificate -- a piece

of paper -- showing ownership of shares that cannot be exchanged for cash unless

and until ITS becomes a publicly-traded entity or ITS, at its sole discretion, makes

an offer to repurchase the outstanding shares.[6]

### 3.    *Plaintiffs' Position in ITS Stock*

Plaintiffs, former employees of ITS, all held ITS stock in the 401(k)

portion of the Plan and did not hold any stock in the ESOP portion of the Plan.

The Plaintiffs held a total of 216,917 ITS shares; 94,037 of which were acquired

through salary deferrals; 13,758 of which were acquired through employer

matching contributions; 89,927 of which were acquired through rollover

contributions; and 19,195 of which were acquired through the exercise of

---

[6] At oral argument, counsel for Defendants admitted that ITS stock is not publicly traded, but argued that "[t]hat doesn't mean all [Plaintiffs] get is a piece of paper . . . . There is actually a request for interest in which there was an offer to purchase the [ITS] stock for $1.50 per share. It's not as though it is simply [a] piece of paper that's not worth any money at all."  Oral Argument Tr. 27.  While the value of the stock certificate might not be utterly worthless, the relevant question -- which the court analyzes more fully *infra* -- is whether the Plaintiffs' benefits have diminished due to the elimination of the put option.  The value of the Plaintiffs' shares and the control which they exercised over those shares differ between the 1998 and 2004 Plans. Under the 2004 Plan, both the value of the ITS shares and the Plaintiffs' ability to sell those shares are under the control and discretion of ITS.  Plaintiffs thus have to wait for an ITS purchase offer in order to receive cash for their holdings.  This is a vastly different scenario than that which existed under the 1998 Plan wherein the Plaintiffs exercised control over whether to sell their ITS shares (subject to the distribution requirements) and were guaranteed to receive, at minimum, a value equivalent to the strike price multiplied by the number of put options exercised.

warrants.  *See* Pls'. Ex. N.  Plaintiff Linda Karins attempted to receive cash in lieu of her stock options by sending a completed claim to ITS.  Karins never received a response and no action was taken regarding her claim.

## B.        Procedural Background

Plaintiffs brought suit on June 23, 2006 alleging that the Defendants' elimination of the right to receive put options for in-kind distributions of ITS stock from the 401(k) portion constituted a violation of ERISA's Anti-Cutback Provision; constituted a breach of fiduciary duty; and various other equity and common law claims.  The Plaintiffs and Defendants filed cross motions for summary judgment on December 15, 2006.  The court heard oral arguments on January 22, 2007.  At oral argument, the court ordered supplemental briefing which the parties filed on January 29, 2007.

## III.  <u>STANDARDS OF REVIEW</u>

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  A party is entitled to summary judgment where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c).  When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the

motion. *Snead v. Metropolitan Property & Casualty Insurance Company*, 237 F.3d 1080, 1086 (9th Cir. 2001). Summary judgment will be mandated if the non-moving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. At Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

## IV. ANALYSIS

A.       **ERISA's Exhaustion Requirement Does Not Apply to the Present Suit**

Defendants argue that Plaintiffs were obligated to exhaust their administrative remedies prior to filing the present suit. The court disagrees. First, the present suit is a legal claim under ERISA rather than a benefits claim under the Plan. Second, requiring exhaustion of administrative remedies in this matter would be futile and would result in an inadequate remedy.

### 1.       *The Present Claim Arises Under ERISA, Not Under the Plan*

As a general rule, ERISA plaintiffs pursuing the enforcement of plan benefits must exhaust their administrative remedies prior to filing federal suit. *See Amato v. Bernard*, 618 F.2d 559, 567-68 (9th Cir. 1980). However, the present claim does not fall within this category: the Plaintiffs filed suit not because they seek enforcement of their benefits under the 2004 Plan, but because they seek

vindication of their rights under ERISA.  Under the explicit terms of the 2004

Plan, the Plaintiffs do not have any put options which they can pursue or seek

enforcement of via the administrative process.  The Plaintiffs are not requesting

the disbursement of benefits provided by the 2004 Plan, nor are they asking for an

interpretation of benefits granted by the 2004 Plan.  Instead, the Plaintiffs are

challenging the wholesale elimination of the put option from the 2004 Plan.  The

claims at issue here cannot be determined under the provisions of either the 1998

Plan or the 2004 Plan; rather, the question presented is whether the termination of

the 1998 Plan and adoption of the 2004 Plan was lawful.  The court therefore finds

that the Plaintiffs' claim that the elimination of the put options contravenes

ERISA's provisions is a claim for rights arising under ERISA, not a claim for

benefits arising under the Plan.  As such, exhaustion of internal administrative

procedures is not required.  *See Graphic Communications Union, Dist. Council

No. 2, AFL-CIO v. GCIV-Employer Retirement Ben. Plan*, 917 F.2d 1184, 1187

(9th Cir. 1990);  *Fujikawa v. Gushiken*, 823 F.2d 1341, 1345 (9th Cir. 1987);

*Amaro v. Continental Can Co.*, 724 F.2d 747, 751-52 (9th Cir. 1984).

\\

\\

\\

## 2.     *Requiring Exhaustion Would Be Futile and the Remedy Inadequate*

As an alternate basis, the court finds that exhaustion of the Plaintiffs' claims would be futile and the remedy inadequate.  Plaintiffs are not required to exhaust administrative remedies when doing so would be futile or the remedy inadequate.  *Amato*, 618 F.2d at 568.  The Plan's internal administrative mechanism is designed to address requests for information regarding the Plan, obtaining a benefit determination, or appealing the benefit determination.  Here, the 2004 Plan does not provide for put options and, as Defendants' counsel admits, the Plan Administrator does not have the power to rewrite the 2004 Plan to include put options because only the Board of Directors may amend the Plan.  *See* 2004 Plan § 9.1(d); Oral Argument Tr. 24-26.  Even if the Plan Administrator were to go beyond its authority and intrude upon the purview of the Board of Directors by granting the right to put options for in-kind distributions, the change would not be binding or enforceable against the Plan.  The internal procedures available -- namely that participants can appeal to the Plan Administrator -- cannot offer Plaintiffs their desired redress.  The court finds that requiring Plaintiffs to appeal a non-existent benefit to a powerless Plan Administrator would ultimately be a futile and meaningless exercise resulting in an inadequate remedy.  For this reason,

exhaustion of internal administrative remedies is not required. *Amato*, 618 F.2d at 568 (noting that the court would be "guilty of an abuse of discretion if it [did] not . . . [exercise its jurisdiction] when resort to the administrative route is futile or the remedy inadequate.").

**B.**     **Eliminating the Right to Put Options for In-Kind Distributions of Stock Is a Cutback Prohibited by ERISA**

*1. General ERISA Framework*

The 1998 and 2004 Plans are both hybrid ESOP-401(k) retirement plans falling under the purview of ERISA. Under ERISA, an employer has complete discretion in formulating and adopting retirement plans. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) ("Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan."); *Carver v. Westinghouse Hanford Co.*, 951 F.2d 1083, 1088 (9th Cir. 1991) (recognizing that pension plan administrators have "the ability to fashion their own plan formulas."). However, once an employer implements a retirement plan, the employer may only modify the plan within the boundaries established by ERISA. *See Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 512 (1981).

14

Congress enacted ERISA to "ensure that 'if a worker has been promised a defined benefit upon retirement -- and if he has fulfilled whatever conditions are required to obtain a vested benefit -- he actually receives it.'" *Alessi*, 451 U.S. at 510 (*quoting Nachman Corp. v. Pension Benefit Guaranty Corporation*, 446 U.S. 359, 375 (1980)); *see also Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004) ("There is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them."); *Lockheed Corp.*, 517 U.S. at 887 ("ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits . . . ."). The ERISA statutory and regulatory framework differ from those set by other equity investment regulations. "[A] participant in an ERISA plan does not assume the same levels of risk as a typical equity investor. Indeed, one of ERISA's principal purposes is to minimize risks to a participant's retirement benefits." *In re Merrimac Paper Co., Inc. v. Harrison*, 420 F.3d 53, 64 (1st Cir. 2005).

The court now considers whether the Defendants' elimination of the put option for in-kind distributions from the 401(k) portion of the Plan violates ERISA's Anti-Cutback Provision.

15

### 2. *Eliminating Put Option Rights for In-Kind Distributions Violates ERISA's Anti-Cutback Provision*

ERISA's Anti-Cutback Provision prohibits employers from adopting modifications that eliminate a participant's optional forms of benefits:[7]

> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan,[8] other than an amendment described in section 302(c)(8) or 4281 of this title [29 U.S.C. § 1082(c)(8) or 29 U.S.C. § 1441][9]

---

[7] That the Defendants argue that they terminated the 1998 Plan and adopted the 2004 Plan in its stead -- rather than merely amend the 1998 Plan -- does not affect the court's analysis. The legislative history of the 1984 amendments to ERISA indicates that Congress intended benefits to have the same protection regardless of whether the benefit plan was amended or terminated. *See* S. Rep. No. 98-575, 98th Cong., 2d Sess. 31, reprinted in 1984 U.S.C.C.A.N 2547, 2577 ("Terminated Plans: The bill does not provide an exception to the prohibition against reduction of benefits or elimination of benefit options in the case of a terminated plan. Accordingly, a plan is not to be considered to have satisfied all of its liabilities to participants and beneficiaries until it has provided for the payment of contingent liabilities with respect to a participant who, after the date of the termination of a plan, meets the requirements for a subsidized benefit."); *see also* 26 C.F.R. § 1.411(d)-4, Q&A-2(a)(3)(i) (2004) ("[I]f an employee's benefit under a defined contribution plan is transferred to another defined contribution plan (whether or not of the same employer), the optional forms of benefit available with respect to the employee's benefit accrued under the transferor plan may not be eliminated or reduced except as otherwise permitted under this regulation."); *Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1150 (3d Cir. 1993) (Alito, J., concurring) (applying Rev. Ruling 85-6 to discussion of 29 U.S.C. § 1054(g)).

[8] Defendants spend much effort arguing that the put options are not accrued benefits under 29 U.S.C. § 1054(g)(1). The Defendants' arguments are not relevant to the Plaintiffs' claims. The Plaintiffs' claims were brought under the Anti-Cutback Provision as amended by the Retirement Equity Act of 1984 to include protection for optional forms of benefits. *See* 29 U.S.C. § 1054(g)(2)(B) (2007). Plaintiffs conceded during oral argument that they were not alleging that the elimination of the put option constituted a reduction of accrued benefits under § 1054(g)(1). *See* Oral Argument Tr. 31.

[9] These exceptions are not relevant to the present matter.

(2) For purposes of paragraph (1), a plan amendment
which has the effect of . . .
(B) eliminating an optional form of benefit,
with respect to benefits attributable to service before the
amendment shall be treated as reducing accrued benefits.

29 U.S.C. § 1054(g) (2007).  The anti-cutback provision is substantially identical

to that provision contained in the Internal Revenue Code[10] and the Secretary of the

Treasury has "the ultimate authority to interpret these overlapping anti-cutback

provisions."  *Central Laborers' Pension Fund*, 541 U.S. at 746.  Regulations

referring to the Internal Revenue Code version of the anti-cutback rule apply with

equal force to ERISA.  *See* 53 Fed. Reg. 26050, 26053 (1988) ("The regulations

---

[10]  The relevant portion of the Internal Revenue Code provides:

(6) Accrued benefit not to be decreased by amendment.

(A) In general. A plan shall be treated as not satisfying the
requirements of this section if the accrued benefit of a participant is
decreased by an amendment of the plan, other than an amendment
described in section 412(e)(2) [26 U.S.C. § 412(e)(2)] or section
4281 of the Employee Retirement Income Security Act of 1974 [29
U.S.C. § 1441].

(B) Treatment of certain plan amendments. For purposes of
subparagraph (A), a plan amendment which has the effect of . . .
(ii) eliminating an optional form of benefit,
with respect to benefits attributable to service before the
amendment shall be treated as reducing accrued benefits.

26 U.S.C. § 411(d) (2007).

under [26 U.S.C. § 411(d)(6)] are also applicable to provisions of ERISA [29 U.S.C. § 1054(g)].”); *Central Laborers' Pension Fund*, 541 U.S. at 747.

The Anti-Cutback Provision is backward looking.  Although it precludes an employer from reducing accrued benefits, including already-granted optional forms of benefits, the Anti-Cutback Provision does not prevent employers from specifying *in advance* of accrual that the availability of a protected benefit will be limited.  Employers are also “perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, *future* employment: ‘a plan may be amended to eliminate or reduce . . . protected benefits with respect to benefits not yet accrued.’”  *Id.* at 747 (citations omitted) (emphasis added).  Finally, employers are free to eliminate optional forms of benefits which cause hardship upon the Plan so long as doing so does not eliminate a valuable right of a participant or beneficiary.  *See, e.g.*, 29 U.S.C. § 1054(g)(2)(B) (2007) (“[This paragraph shall not apply to any plan amendment which reduces or eliminates benefits or subsidies which create significant burdens or complexities for the plan and plan participants, unless such amendment adversely affects the rights of any participant in more than de minimis manner.”); 26 U.S.C. § 411(d)(6)(B)(ii) (2007) (“The Secretary shall by regulations provide that this subparagraph shall not apply to any plan amendment which

18

reduces or eliminates benefits or subsidies which create significant burdens or complexities for the plan and plan participants, unless such amendment adversely affects the rights of any participant in more than de minimis manner."); S. Rep. No. 98-575, 98th Cong., 2d Sess. 30, reprinted in 1984 U.S.C.C.A.N. 2547, 2576 (advising that an optional form can be eliminated if "the elimination of the option does not eliminate a valuable right of a participant or beneficiary . . . .").

Defendants' argument that ERISA does not mandate an irrevocable put option for salary deferrals or rollover contributions misses the point -- the question is not whether the put option feature was mandated at the inception of the 401(k) portion of the 1998 Plan but whether the put options can be taken away once implemented.  ITS was free to design its Plan in a manner of its choosing and is free to modify the Plan as it relates to future, not yet accrued benefits.  Once the Plan was formed, however, the Anti-Cutback Provision prohibits the elimination of an optional form of benefits which is of value to participants.[11]

---

[11] Defendants' argument that *Flynn v. Ballinger*, 1994 WL 758662 (N.D. Cal. May 9, 1994), defeats Plaintiffs' claims is similarly unpersuasive.

First, Defendants cite *Flynn* as support for their argument that the put option is not an accrued benefit protected by the Anti-Cutback Provision.  However, the question of whether the put option is an accrued benefit is not presently before this court -- the relevant inquiry is whether the put option is an optional form of benefit, elimination of which is prohibited under 29 U.S.C. § 1054(g)(2)(B).

Second, the facts presented in *Flynn* differ significantly from those at hand.  In *Flynn*, the ESOP issued the plaintiffs stock subject to put options which the company -- not the plan -- then

(continued...)

> ### a. An in-kind distribution subject to a put option is an optional form of benefit

Under the applicable Treasury Regulations, an optional form of benefit is defined as:

> a distribution form with respect to an employee's benefit . . . that is available under the plan and is identical with respect to all features relating to the distribution form, including the payment schedule, timing, commencement, medium of distribution (i.e., in cash or in-kind), the portion of the benefit to which such distribution features apply and the election rights with respect to such optional forms.  To the extent there are any differences in such features, the plan provides separate optional forms of benefit.  Differences in amounts of benefits, methods of calculation, or values of distribution forms do not result in optional forms of benefit for purposes of this rule.

26 C.F.R. § 1.411(d)-4, Q&A-1(b) (2004).  Another section of the Treasury Regulations expounds upon the definition:

---

[11](...continued)
refused to honor.  The court found that because the *Flynn* plaintiffs had received a lump sum distribution of their stock subject to the put options, and because the exercise of the put options was binding against the company and not against the ESOP, the *Flynn* plaintiffs were not "participants" under 29 U.S.C. § 1002(7) and the company's refusal to honor the put options was not a denial of benefits.  The *Flynn* court thus found that the plaintiffs lacked standing to sue the ESOP under ERISA (but could sue the company directly for refusing to honor the put options) and granted the defendants' motion to dismiss under Fed. R. Civ. Pro. 12(b)(1).

Here, the facts are the opposite of those facing the *Flynn* court: The Plaintiffs are suing to receive the put options accorded to their shares under the 1998 Plan.  Because the 1998 Plan has not yet distributed the benefits provided therein -- that is, shares subject to a put option -- the Plaintiffs remain participants under 29 U.S.C. § 1002(7).  Moreover, contrary to the situation in *Flynn*, the Plaintiffs' claims are for rights arising under ERISA and enforceable against the Plan.

> The term optional form of benefit means a distribution
> alternative (including the normal form of benefit) that is
> available under a plan . . . . [D]ifferent optional forms of
> benefit exist if a distribution alternative is not payable on
> substantially the same terms as another distribution alternative.
> The relevant terms include all terms affecting the value of the
> optional form . . . . Thus, for example, different optional forms
> of benefit may result from differences in terms relating to the
> payment schedule, timing, commencement, medium of
> distribution (e.g., in cash or in kind), election rights,
> differences in eligibility requirements, or the portion of the
> benefit to which the distribution alternative applies.

26 C.F.R. § 1.401(a)(4)-4(e)(1) (2004).[12]

In plain language, an optional form of benefit is a distribution form

which differs in a feature (such as medium, i.e., cash or in-kind) from other

---

[12]  The Defendants cite to a contrary definition of optional form of benefits contained in Treasury Regulations adopted on August 12, 2005 after the events of this case took place:

> The term optional form of benefit means a distribution alternative
> (including the normal form of benefit) that is available under the plan with
> respect to an accrued benefit or a distribution alternative with respect to a
> retirement-type benefit.  Different optional forms of benefit exist if a
> distribution alternative is not payable on substantially the same terms as
> another distribution alternative.  The relevant terms include all terms
> affecting the value of the optional form, such as the method of benefit
> calculation and the actuarial factors or assumptions used to determine the
> amount distributed.  Thus, for example, different optional forms of benefit
> may result from differences in terms relating to the payment schedule,
> timing, commencement, medium of distribution (e.g., in cash or in kind),
> election rights, differences in eligibility requirements, or the portion of the
> benefit to which the distribution alternative applies.

26 C.F.R. § 1.411(d)-(3)(6)(ii) (2007).  However, the Internal Revenue Code provides that Treasury Regulations do not apply retroactively.  *See* 26 U.S.C. § 7805(b)(1) (2007).

distribution forms, including any term which affects the value of the benefit form.

A change in one of these features eliminates the optional form.  It is thus clear that

"all features relating to the distribution form" qualify as an optional form of

benefit, including, for example, "payment schedule, timing, commencement,

medium of distribution (i.e., in cash or in-kind), the portion of the benefit to which

such distribution features apply and the election rights with respect to such

optional forms."

      The court must determine whether a put option is a type of feature

that should be given the same protection as those included in the illustrative list

included in the Treasury Regulations.[13]  A put option allows participants to access

a cash market for their stock at a set sale price ("strike price").  Eliminating the put

option from the 1998 Plan creates a different distribution form, namely the in-kind

distribution form provided in the 2004 Plan which denied participants a cash

market for their stock.  As the Summary of Material Modifications explained,

"employer shares in the new Plan will be distributed to [participants] in kind under

the new Plan provisions and will not [be] convertible to cash."  Summary of

Material Modifications ¶ 4.  The court therefore finds that the put option was a

---

[13]  Insertion of the word "including" as a preceding phrase makes clear that the list provided is merely illustrative, and is not limited to the optional forms of benefits specified. *See West v. Gibson*, 527 U.S. 212, 217 (1999).

"feature relating to the distribution form" of the in-kind distribution of ITS stock under the 1998 Plan and that termination of this feature served to eliminate an optional form of benefit.

### b.    A put option is a valuable right

Under  29 U.S.C. § 1054(g)(2)(B), *accord* 26 U.S.C. § 411(d)(6)(B)(ii), a company can eliminate an optional form of benefit which create "significant burdens or complexities for the plan or plan participants" so long as such an elimination does not affect the rights of any participant in more than a de minimis matter.  *See also* S. Rep. No. 98-575, 98th Cong., 2d Sess. 30, reprinted in 1984 U.S.C.C.A.N. 2547, 2576 ("The regulations also could permit the elimination of an option if (1) the elimination of the option does not eliminate a valuable right of a participant or beneficiary, and (2) the option is not subsidized or a similar benefit with a comparable subsidy is provided.").  Defendants have not demonstrated that the put option creates a significant burden for the Plan.  Even had they done so, however, the court concludes that the put option under the 1998 Plan was a valuable right.

Generally speaking, a put option is a derivative contract giving the option holder the right, but not the obligation, to sell a specified security at a

specified strike price within a specified time.  In the open market, put options can serve either as insurance against a southward market for conservative investors or as profit-maximizers for speculative investors.

Since ITS stock is not publicly traded, the put option feature was the only means through which Plan participants could access a cash market for their ITS stock.  ITS shares held in the 1998 Plan were subject to put options which, upon separation and demand of the participants, required ITS to repurchase the ITS stock at a strike price and time determined under the provisions of the 1998 Plan itself.  Absent the put option right, the only way that the participants may receive cash for their ITS stock would be if ITS were to go public or if ITS, at its discretion, offered to buy out participants' shares.  At the moment that the 2004 Plan was signed, the Plaintiffs, who were once able to exercise control (subject to the required distribution schedule and strike price) over their 401(k) investments, found themselves at the mercy and whim of ITS regarding whether they may ever sell their ITS stock and, if so, for how much.

The ability to receive cash for one's shares -- as guaranteed by a put option -- is a valuable right.  A reasonable Plan participant would surely take the existence (or absence) of a put option right -- and its corresponding guarantee that they would be able to sell the stock for cash at a set strike price -- into

24

consideration when choosing where to invest their retirement savings.

In light of the above, the court finds that eliminating the right to put options for in-kind distributions of ITS stock was a reduction of an accrued benefit under 29 U.S.C. § 1054(g)(2)(B). The court must consider, however, whether the 1998 Plan is statutorily exempted under the "ESOP Exception" to the Anti-Cutback Provision.

## C.       The Plan Does Not Fall Within the ESOP Exception

One question remains: Does the Plan (or relevant portion of the Plan) fall within the Anti-Cutback Provision's exception for ESOP Plans ("ESOP Exception")?[14] Under the ESOP Exception, an "employee stock ownership plan (as defined in section 4975(e)(7) of such Code [26 U.S.C. § 4975 (e)(7)]), shall not be treated as failing to meet the requirements of [the Anti-Cutback Provision] merely because it modifies distribution options in a nondiscriminatory manner." 29 U.S.C. § 1054(g)(3)(B) (2007). The Internal Revenue Code includes an identical exception.[15]

---

[14]  Other statutory exceptions, including exceptions where a single lump sum payment has been made or relating to options of de minimis value and plan-to-plan transfers, do not apply to the facts of this case.

[15]  The Internal Revenue Code provides that ESOPs under 26 U.S.C. § 4975(e)(7) "shall not be treated as failing to meet the requirements of this paragraph merely because it modifies
(continued...)

An ESOP is a tax qualified plan which is formally designated as an ESOP in the plan document and meets various regulatory requirements. *See* 26 C.F.R. § 54-4975-11(a)(2) (2007) ("to be an ESOP, a plan must be formally designated as such in the plan document."). The Internal Revenue Code defines an ESOP as:

> a defined contribution plan--
>
> (A) which is a stock bonus plan which is qualified, or a stock bonus and a money purchase plan both of which are qualified under section 401(a), and which are designed to invest primarily in qualifying employee securities; and
>
> (B) which is otherwise defined in regulations prescribed by the Secretary.
>
> A plan shall not be treated as an employee stock ownership plan unless it meets the requirements of section 409(h), section 409(o), and, as applicable, section 409(n), section 409(p), and section 664(g) and, if the employer has a registration-type class of securities (as defined in section 409(e)(4)), it meets the requirements of section 409(e).

26 U.S.C. § 4975(e)(7) (2007). This definition is similar to that contained in ERISA's statutory language.[16]

---

[15](...continued)
distribution options in a nondiscriminatory manner." 26 U.S.C. § 411(d)(6)(C)(ii) (2007).

[16] ERISA defines an ESOP as:

(continued...)

Here, ITS adopted a hybrid or combined ESOP-401(k) plan.  The

Plan was "administered as a single trust with two sub-trusts.  One sub-trust [held]

the funds and stock attributable to the ESOP portion of the Plan and the other sub-

trust [held] the Salary Deferral and Rollover Accounts that are attributable to the

401(k) portion of the Plan." 1998 Plan § 10.1.   The ESOP portion of the 1998

Plan constituted "the portion of the Plan that is designed to be an employee stock

ownership plan within the meaning of Section 4975(e)(7) of the Code and Section

407(d) of ERISA."  1998 Plan § 2.28.  The 401(k) portion of the 1998 Plan

constituted "the profit sharing portion of the plan that contains a cash or deferred

feature and is designed to be qualified under Section 401(a) and 401(k) of the

Code and is separate and distinct from the ESOP portion of the Plan."  1998 Plan

§ 2.32.  The 401(k) portion provides for both a salary deferral account (for

participants making salary deferral contributions and for ITS matching

---

[16](...continued)
> The term "employee stock ownership plan" means an individual account plan –
>
> (A) which is a stock bonus plan which is qualified, or a stock bonus plan and money purchase plan both of which are qualified, under section 401 of the Internal Revenue Code of 1986 [26 U.S.C. § 401], and which is designed to invest primarily in qualifying employer securities, and
>
> (B) which meets other requirements as the Secretary of the Treasury may prescribe by regulation.

29 U.S.C. § 1107(d)(6) (2007).

contributions) and a rollover account (for assets transferred from qualified plans). *See* 1998 Plan §§ 2.32, 2.49, 4.1(b), 2.47, 2.48, 5.1(f)(ii)-(iv), 5.1(g), 8.12. Participants are allowed to control their investments by electing to invest in ITS stock or other securities.

Defendants argue that although the Plan had separate ESOP and 401(k) portions, its distribution rules overlapped both, and as a result, the Defendants' elimination of the put option right was permitted under the ESOP Exception. The court disagrees.

First, the existence of overlapping distribution rules does not convert the 401(k) portion to an ESOP when the plain language of the Plan document sets up two different portions -- ESOP and 401(k) portions -- and decrees that they are "separate and distinct." The Treasury Regulations themselves recognize that a Plan may have both ESOP and non-ESOP portions -- and that the non-ESOP portions are not ESOPs. *See* 26 C.F.R. § 54.4975-11(a)(5) (2007) ("An ESOP may form a portion of a plan the balance of which includes a qualified pension, profit-sharing, or stock bonus plan which is not an ESOP."). The 401(k) portion does not convert to an ESOP simply because it was established in the same overarching plan as the ESOP portion.

Second, the fact that the Defendants "deemed" the ITS stock to be part of the ESOP portion of the 2004 Plan does not automatically make it so.  The Plan participants did not voluntarily elect to transfer their holdings from the 1998 Plan to the 2004 Plan.  Defendants cannot force the transfer of ITS stock from the 401(k) portion of the 1998 Plan to the ESOP portion of the 2004 Plan in a manner that eliminates an optional form of benefits.

Third, the Plan's ITS stock was acquired by contributions to the 401(k) portion, not ESOP portion.  The ESOP portion of the Plan could only be funded by ITS cash contributions or loans leveraged against ITS stock.  The record does not reflect that ITS ever made any profit contributions to the ESOP portion of the Plan or that any leveraged loans ever existed.  Under the Tax Code, Treasury Regulations, and explicit terms of the 1998 Plan, the types of contributions that did exist -- namely salary deferrals and rollovers from qualified plans -- could only be used to fund the 401(k) portion, and could not be used to fund the ESOP portion.  *See* 26 U.S.C. § 4975(e)(7) (2007); 1998 Plan §§ 2.48, 2.49.

Finally, if the ITS stock were to be held in the ESOP portion, the Defendants would not be permitted to eliminate the put option feature (at least as it applied to exempt loans to leveraged ESOPs) under Internal Revenue Code and applicable Treasury Regulations.  *See* 26 U.S.C. § 409(h)(1)(B) (2007); 26 C.F.R.

29

§§ 54.4975-7 to 11.

Given the above, the court finds that the ESOP and 401(k) portions are distinct and separate and that the ESOP Exception does not apply to ITS stock held in the 401(k) portion of the Plan.

The court therefore concludes that the put option is an optional form of benefit under the 1998 Plan, the elimination of which is prohibited by ERISA's Anti-Cutback Provision, 29 U.S.C. § 1054(g).

**D.        Remedy**

The court is now faced with fashioning an equitable remedy.  In seeking to fashion this remedy, the court wishes to avoid imposing either a windfall or undue hardship on either party.  Rather than ruling on the remedy at this time, the court believes it is in the interests of justice for the parties to make a good faith effort to settle this matter given the court's ruling that the put option is an optional form of benefit under the 1998 Plan and its elimination in the 2004 Plan violated ERISA's Anti-Cutback Provision.

The court therefore orders the parties to be prepared to discuss settlement with Magistrate Judge Kurren at the status conference currently set for April 10, 2007.  If the parties are unable to reach an agreement as to settlement or an appropriate remedy, the parties are to appear before this court at 11:00 AM on

May 21, 2007 for a further hearing on appropriate remedies.

**E.        Remaining Claims**

Because the court finds that elimination of the put option is a cutback prohibited by ERISA, it does not reach the Plaintiffs' alternate claims, including claims that the elimination constituted a prohibited reversion under 29 U.S.C. § 1103(c); constituted a prohibited transaction under 29 U.S.C. § 1109; constituted an imprudent investment under 29 U.S.C. § 404(a)(1); failed due to lack of consideration; breached the 1999 Shareholders Agreement; and constituted a violation of the Defendants' fiduciary duties.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the court GRANTS Plaintiffs' Motion for Summary Judgment and DENIES Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 27, 2007.



_/s/ J. Michael Seabright_
J. Michael Seabright
United States District Judge

_Goodin et al. v. Innovative Technical Solutions, Inc., et al_, Civ. No. 06-00344 JMS/BMK, Amended Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment

31